**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**


| | |
|---|---|
| Lawsin Whitfield, ) | **CASE NO. 1:20 CV 2301** |
| ) | |
| Plaintiff, ) | **JUDGE PATRICIA A. GAUGHAN** |
| ) | |
| vs. ) | |
| ) | |
| ) | |
| CSX Transportation, Inc., ) | <u>**Memorandum of Opinion and Order**</u> |
| ) | |
| Defendant. ) | |


<u>**Introduction**</u>

This matter is before the Court upon Defendant's Motion for Summary Judgment. (Doc. 16). This case arises under the Family Medical Leave Act ("FMLA"). The motion for summary judgment is unopposed as to Counts One and Three. On Count Two, Plaintiff opposes summary judgment for FMLA retaliation, but does not oppose summary judgment for FMLA interference. For the reasons that follow, this Court GRANTS the motion.

<u>**Facts**</u>

Plaintiff Lawsin Whitfield brings this action against Defendant CSX Transportation, Inc. Plaintiff began working for Defendant, a railroad transportation company, in 1998. Defendant promoted him to the non-union manager position of trainmaster around March 2017. Defendant appointed Matthew Day as Plaintiff's manager around August 14, 2017. Plaintiff testified that in the summer of 2017, he informed Day of a forthcoming doctor's appointment. According to Plaintiff, Day demanded to be told immediately of the doctor's findings. After the doctor's visit, Plaintiff called Day to inform him that the doctor diagnosed Plaintiff with a heart condition,

1

mononucleosis, and work-related stress, and told Plaintiff he must take time off. According to

Plaintiff, Day refused to grant Plaintiff leave, so Plaintiff continued to work. (Doc. 9–1 at 55–

56).

Day testified that this phone call did not occur and he never denied leave. A number of

defense witnesses, including Defendant's benefits manager, testified that Day did not have the

authority to deny leave. (Doc. 10–1 at 8, 13). Instead, FMLA claims are handled by a third-party

vendor. (Doc. 15–1 at 227).

Defendant ultimately granted FMLA leave on September 9, 2017. Shortly after

commencing leave, Plaintiff filed an ethics complaint with Defendant alleging that Day had

prevented him from taking timely medical leave and the work environment had become hostile

due to "aggressive conference calls, long hours and threats of termination." (Doc. 9–6 at 103).

Soon after filing the ethics complaint, fellow trainmaster Kyle Knautik allegedly told

Plaintiff that Day said on a phone call with multiple trainmasters that he was going to fire

Plaintiff when Plaintiff returned to work. (Doc. 9–1 at 60). Plaintiff did not personally hear Day

make this threat and there was no indication why Day intended to fire Plaintiff. (Id.).

Defendant investigated Plaintiff's ethics complaint and concluded there was "insufficient

evidence" Day had denied Plaintiff leave. (Doc. 9–6 at 103). This investigation also revealed

it was "reasonable to believe" that Day had generally threatened on phone calls to terminate

managers, although there was no conclusion about specific threats. As a remedial measure, the

report indicated that Day was instructed on how to be more respectful.

According to the investigation report, a Human Resources ("HR") representative for

Defendant informed Plaintiff about the investigation results in November 2017. (Id.). Plaintiff

expressed concern to the HR representative that he would be fired upon his return to work because of the ethics complaint and because of Day's alleged threats.

In February 2018, Plaintiff was medically cleared. When Plaintiff returned to work, Defendant put Plaintiff back under Day's supervision, although Plaintiff testified that he asked to be transferred to a new yard.

According to Plaintiff, he received a yearly performance review not long after he returned from leave. At this point, Day had only managed Plaintiff for several weeks in total. Plaintiff testified that Day gave him a poor grade, the only one he had received in his 20-year tenure. Day testified that the review stated Plaintiff "sometimes achieved expectations," and Plaintiff had "good knowledge of locomotive operations." Day's testimony indicated his interactions with Plaintiff were limited so "there's not a whole lot to judge [Plaintiff] on" and he "thought [Plaintiff] was a fine employee." Neither party produced the performance review for this Court.

Sometime after his negative performance review, Plaintiff was appointed trainmaster of Defendant's Ashtabula trainyard. Plaintiff claimed he had been inadequately trained to run a busy yard like Ashtabula and was left to rely on instructions from another trainmaster at the yard.

On April 20, 2018, Plaintiff was involved in a railyard incident that occurred during a "shove move." A "shove move" is a train movement where the train is pushed backwards by the engine rather than pulled forward by the engine. Because the train is moving backwards, the conductor cannot see the direction of travel unless he is riding in the back of the train or standing to its side. The conductor needs to know how far backwards the train can go without running through a "switch," which is a mechanism that allows the train to change tracks. Preventing the train from going through a switch is called "protecting the move." Defendant claims the

consequences of running through a switch are serious, while Plaintiff claims the consequences are minimal and common.

The parties agree the train conductor—not the trainmaster—generally has the responsibility for "protecting the move." Conductors typically do so in one of two ways. The first method is to ride the leading car and communicate to the engineer about what he sees so the engineer may stop the train. This is called "riding the shove." In a shove move, the leading car is on the back end of the train. The second method uses a "car count," which involves another railyard employee—the yardmaster—telling the conductor how much space the track has left. The conductor watches the train from the side and counts the number of cars that have passed. The conductor relays this to the engineer who stops the train when an appropriate number of cars has passed. The car count is faster than having the conductor ride the end car because the conductor does not need to travel as far to get back to the engine.

According to Defendant and the conductor's union, proper operating procedure required the conductor to be physically present in the end car—to "ride the shove." In other words, car counts were not allowed.

The April 20, 2018 incident revolved around a shove move that resulted in a run-through switch. Plaintiff testified that he was helping a crew with a shove move because another trainmaster at the Ashtabula yard informed him trainmasters should be at the lead end of shove moves to "expedite" such moves by transporting conductors back to the front of the train.

The yardmaster informed the crew over the radio that there was enough room for the train on the track without running the train through a switch. The crew included a conductor and an engineer. Plaintiff testified that he told the crew he would be near the back of the train to "assist," which meant only that he would be available to drive the conductor back to the front of

the train and serve as an emergency backstop to prevent the train from going beyond the switch. (Doc. 12–1 at 188).

Plaintiff testified he instructed the conductor to use the car-count method to protect the shove before the move began. (Doc. 9–1 at 72) ("Q: Did you ever direct the conductor to remain on the east end during the shove? A: I did."). At another point, he testified the conductor had asked Plaintiff if the conductor could remain on the east end, and Plaintiff said yes. (Id. at 69). Plaintiff usually instructed conductors to use a car count, but conductors typically ignored Plaintiff's order and rode the last car to protect the shove. This time, Plaintiff noticed the conductor was not riding the last car.

The train began moving backward and Plaintiff realized the train was not going to fit on the track without running through a switch. He testified that he alerted the crew on the radio to try to stop the train but received no response. Approximately one and a half train cars backed through the switch before the train came to a halt. Plaintiff called Day to inform him of the incident. Day added Rob Sarver, Day's boss, to the call. Plaintiff testified that he informed Day he had instructed the conductor to protect a shove using a car count.

According to Day, Plaintiff told him about the incident and said the crew was blaming Plaintiff, even though Plaintiff claimed he only told the crew that he would be on the back end of the train to "assist." In response, Day allegedly threatened the crewmembers' jobs. Day and Sarver asked Plaintiff to collect statements as well as to produce his own statement. Day himself obtained the yardmaster's statement.

Relevant parts of Plaintiff's statement from that day read as follows:

> [t]he crew thought I said I was at the West end of the track. My purpose of going out to the West End of the Yard was to assist the conductor . . . . Once the shove was to be completed, I would take him back up to the east end of the yard . . . .

5

> When I got out to the west end of the yard, I could see that the shove had already started prior to me getting in position. I did not give any car counts, or take part in the shove what so ever. My purpose was to be there for safety, and stop the move if necessary. . . . I expected to see the conductor riding the shove . . . but he was not.
>
> I attempted to back up to see exactly how much more room the crew had, while telling them to stop their movement . . . . The crew did finally stop, but did go a car and a half through the number two switch at the west end of the yard. . . . I immediately let them know that they had run the switch, and asked the conductor why he wasn't riding the shove to protect it? He stated that the [dispatcher] had told him to expedite the move, because there was a train behind them coming to work at Ashtabula as well. . . .
>
> At no time did I give car counts, speak to the crew during their shove (other than telling them to stop the move), or tell the crew when to start their shove move, or take any part in the move. That was not my purpose for being back at the west end of the yard to assist the crew. The purpose was to stop the train if necessary, and give the conductor a ride to the head end when he was done with the shove move. . . . The crew originally stated that they thought I was at the west end of the yard, and that they believed they had more than enough room on track number two . . . .

(Doc. 11–2 at 173). The conductor's statement of the incident reads as follows in relevant part:

> Dispatcher told us . . . that [Plaintiff] would be assisting us to get in and out as quickly as possible. . . . [Plaintiff] told us he would be at the West End . . . . When I had a job briefing with [Plaintiff] he said he would be at the West End of Class 2 and I could stay at the East End . . . I was under the assumption that I was to be at the East End . . . and the [Plaintiff] was watching the West End . . . . I was told by the dispatcher that [Plaintiff] would be helping us and to make the move as quickly as possible.

(Doc. 11–2 at 175). The engineer's statement reads in relevant part:

> [Plaintiff] was at the west end and [the yardmaster] volunteered to relay by radio in case we could not be heard or could not hear [Plaintiff]. We were shoving East to West. We had a job briefing with the trainmaster before starting the shove. I received Radio message from [Plaintiff] to ease it up and I was coming to a stop per my conductors [sic] instructions anyways.

6

(Doc. 11–2 at 176).

The following day, Plaintiff wrote an email to Day. That email reads as follows:

> [a]fter speaking with crew, and getting statements (Emailed to you [Day]), the crew owned up to not protecting the shove. Was remorseful for not accepting ownership initially. Conductor and engineer stated that after the yardmaster changed their original move, that they still believed they could put the entire set on track number two, and still have around 2000 feet extra. I told the crew our operation here at Ashtabula is that unless they are sure that the setoff will fit without a doubt, that they have to ride the shove in, protecting the movement. I also let them know I would go to the west end of the yard, to give an assist to the conductor, and bring him back to the head end after he was down with his shove move. At the west end of the yard, I was unable to reach the crew on the same channel, telling them to "stop their movement" several times. The crew subsequently ran through the number two switch at the West end of the yard by one and a half cars. . . .

(Doc. 14–2 at 223). In an "executive summary" attached to that email, Plaintiff wrote:

> [c]onductor [did] not ride shove, states reason was that the dispatcher was rushing him, and he was sure the track could hold the entire setoff, plus an additional 2000 feet. I get in position to assist crew at west end of yard . . . .

(Id. at 224).

Yardmaster Jason Hudson's statement, which Day collected, stated

the following in pertinent part:

> [Plaintiff] called crew on radio and stated he would head to west end to watch/assist with shove and keep conductor at East End. I didn't hear much during the crews shove movement other than some car counts.

(Doc. 11–2 at 182).

On Saturday, April 21, 2018, the investigation began to focus on Plaintiff because Day

received two "unusual phone calls" from Plaintiff regarding the train incident. (Id. at 79). Day

wrote the following statement to his immediate manager, Sarver:

7

> On Friday, April 20th . . . I received a txt from [Plaintiff] about a run through switch . . . . As [Plaintiff] explained the events, he stated that the crew was blaming him for the incident, b/c he was on the west end of the yard in a position to assist. I asked him what the assist meant and he explained he was there to provide a ride for the conductor to the headend after the shove was complete. As the move was taking place, he did not see the conductor riding the leading end of the movement and he radioed for the crew to stop.

> During my conversation with [Plaintiff], he stated that that crew was saying he was responsible since he was on the west end assisting. These statements from the crew and their unwillingness to accept responsibility and blame [Plaintiff], led to the decision to pull the crew from service.

> As my investigation of the incident continued, I attempted to pull main line and yard radio tapes to listen to the audio. Mainline tapes were the only ones available as the yard is not recorded. These tapes did not provide any information about the incident.

> On Saturday, I received (2) unusual phone calls from [Plaintiff]. The first call, he expressed extreme stress around the situation and that during interaction with other crews, he was getting blamed for the incident. The second call, [Plaintiff] was angry that the cars came out the other end of the track, saying in his words "they should have fit". These emotional calls began to cast some confusion about his story.

> On Sunday, I received the written statement from Yardmaster Jason Hudson, who was on duty when the incident occurred. His statement was that he heard [Plaintiff] inform the conductor to stay on the east end of the track and that he was going to protect the shove. After interviewing Mr. Hudson, he verbally stated the same thing.

(Doc. 11–2 at 172).

Day testified that Plaintiff's behavior on these phone calls had "alarm[ed]" him, so he called Sarver and told him that these calls made Day question Plaintiff's original version of events. Sarver and Day reviewed the radio tapes from the incident and concluded there "was nothing . . . of substance on the radio tapes." (Doc. 12–1 at 189). Day does not know why the tapes were not produced for this case.

8

After this conversation, Sarver collected the statements and either Sarver or Day interviewed the crewmembers individually. Sarver then wrote a memo regarding the incident which begins with a description of the initial phone call between Plaintiff, Day, and Sarver. That memo reads in relevant part:

> I asked [Plaintiff] where the conductor was located. He stated that he was on the east end and was not at, on, or ahead of the leading end of the shove movement. I asked if the conductor could have viewed the end of the shove movement from the east end in which Plaintiff replied no. I then asked him what would make the conductor willfully neglect the rules and not protect the shove. Plaintiff stated he did not know. I specifically asked [Plaintiff] what he meant when he told the crew he would be at the west end to assist. He stated that it was solely for purpose of giving the conductor a ride back to the east end and that was something that regularly occurred at Ashtabula to expedite movements in and out of the yard. I asked if he had heard the instructions given by the Yardmaster . . . and he said he did not. He heard the dispatcher talk to the crew as they were pulling in in which it was stated [Plaintiff] was there to assist. . . .

> At this point I told [Plaintiff] to interview the crew and to understand why the conductor did not properly protect the shove. When [Plaintiff] had concluded this interview he called [Day] and I back. He stated that both crewmembers said that they had the understanding that [Plaintiff] would protect the shove from the west end. I asked [Plaintiff] what would make them believe that and he said he did not know. I asked if there was anything that he said to the crew to make them believe that he was going to protect the shove in which he replied no. After speaking about this with [general manager] Male it was concluded that we would pull the crew out of service and charge them with a major violation for willful neglect of their duties. . . .

> On Saturday [April 21st], Day had received the dispatcher radio recording and reviewed them. The dispatcher stated that [Plaintiff] would be there to assist but nothing further. [Day] informed me that the yard channel was not recorded so he was unable to hear the transmissions between the yardmaster and crew. . . .

> On Sunday morning [April 22nd], [Day] had sent me the statement from the yardmaster. It stated that [Plaintiff] contacted the crew stating that he would watch/assist with the shove from the west end

and told the conductor to stay on the east end. [Day] questioned the yardmaster again after he wrote the statement and he was adamant that is what [Plaintiff] stated. This was more in line with the statements received from the crew. This made me question why [Plaintiff] would instruct the conductor to stay at the east end if he wasn't protecting the shove from the west end. [Day] informed me that on Saturday [Plaintiff] had stated to him that the equipment should've fit in the track.

At this point I called [Plaintiff] and told him that after further investigating this incident there were some conflicting information in the statements. I told him to go through the entire event again with me step by step. I said that it was imperative that he be fully honest due to the seriousness of the situation and due to the fact he had a crew now out of service and charged with a major violation. After going through the incident again with [Plaintiff] he informed me that the yardmaster, crew, and himself had a briefing over the radio as they were pulling in. He told the crew that he would be on the west end to "assist and protect the shove" and he instructed the conductor to stay at the east end. . . . When [Plaintiff] arrived at the west end he radioed to the crew to inform them he was there. The yardmaster relayed that information as it was not heard by the crew. Since they all believed the equipment would easily fit in the track, [Plaintiff] stated that it was never intended for him to direct the shove. . . .

(Doc. 11–2 at 170).

Sarver wrote, in pertinent part, the following summary of his investigation in an email to his boss, general manager Nick Male:

- The conductor did not protect the shove move.

- [Plaintiff] initially stated that he was only at the west end to give the conductor a ride.

- Crew stated that [Plaintiff] communicated to the conductor to stay at the east end and that he would protect the shove from the west end.

- [Plaintiff] initially denied speaking with the crew other than stating that he was at the west end to assist.

10

- Crew was pulled out of service and charged with a major violation based off of the information initially provided by [Plaintiff].

- Yardmaster stated [Plaintiff] the [sic] told crew he would protect the shove from the west end and for the conductor to stay at the east end.

- Yardmaster, engineer, and conductor were all interviewed separately. Their recollection of the events leading up to the incident were the same.

- 2 days after the incident [Plaintiff] truthfully told what had actually occurred. This matched statements given by the yardmaster and crew.

(Doc. 12–3 at 203). Sarver concluded Plaintiff had been dishonest because Plaintiff first denied knowing why the conductor had failed to ride the shove but later admitted that he told the conductor to use a car count and remain on the east side. (Doc. 12–1 at 191). Sarver testified at his deposition that he considers dishonesty a "big deal." (Id. at 191–92).

Sarver then gave the investigation results to Male. He did not recall offering a disciplinary opinion or recommendation to Male. (Id. at 192). Sarver further testified that he did not know that Day had allegedly denied Plaintiff leave or that Plaintiff had filed an ethics complaint against Day. (Id. at 194–95). Male instructed Sarver to place Plaintiff on administrative leave pending the investigation. Male spoke with Day and Sarver regarding the factual background. (Doc. 13–1 at 211).

Male and an HR representative, Tremaylen Anderson, took over the investigation. According to Male, neither Sarver nor Day expressed an opinion about Plaintiff's potential discipline. (Id.). He further testified that he had no knowledge of Day allegedly denying leave or of Plaintiff's ethics complaint against Day. (Id. at 212). In fact, he stated that Day lacked

11

authority to deny leave and Plaintiff would have known that Day lacked such authority because Plaintiff was a manager. (Id. at 213).

Neither Male nor Anderson conducted any investigation of their own. (Id. at 217). They did not speak with Plaintiff himself. Male testified that he reviewed the written statements and spoke with Sarver and Day. (Doc. 13–1 at 211–12). Male and Anderson concluded that there was no other way to interpret Plaintiff's instructions to the crew except that Plaintiff would be protecting the shove movement. They further concluded that he had not been truthful about this fact because he initially denied knowing why the conductor was not riding the shove movement. (Id.).

Male testified that he took "issue with the dishonesty piece" because "I rely on my managers to be honest and truthful." (Id. at 212–13). Plaintiff testified that managers had lied in the past but had been believed over crewmembers.

Anderson wrote the following "Performance Summary," in pertinent part:

> [Plaintiff] has demonstrated poor decisionmaking and dishonesty. . . . [Plaintiff] was at the west end and witnessed the switch being run thru. When [Plaintiff] was initially asked about the incident, he denied speaking with the crew other than stating that he was at the west end to assist and to give the conductor a ride. The crew was pulled out of service and charged with a major violation based off of the information initially provided by [Plaintiff]. The . . . crew and yardmaster stated that [Plaintiff] communicated to the conductor to stay at the east end and that he would protect the shove on the west end. Two days after the incident, [Plaintiff] truthfully told what had actually occurred. His statement matched the statements given by the yardmaster and crew. Due to poor decision making and dishonesty the business will be terminating [Plaintiff] from management.

(Doc. 11–2 at 168).

Defendant removed Plaintiff from his management position effective May 12, 2018. No other crewmembers faced discipline for the incident other than their initial removal from service. After Defendant notified Plaintiff of his demotion, Plaintiff asked why he had been terminated from management. (Doc. 9–1 at 82). He testified that he was told it was for being untruthful. (Id.). Plaintiff has not faced any other discipline in his 20-year employment with Defendant.

Plaintiff later challenged his demotion with Defendant's HR department. (Doc 9–14 at 112). In this challenge, he also asked about the results of the ethics complaint he previously filed against Day. Defendant's Head of Arbitration and Discipline upheld the demotion on June 26, 2018. As for the ethics complaint, the Head of Arbitration stated that there was a "thorough investigation" and the company could not disclose the results, except to say "appropriate disciplinary actions are taken when a company policy is violated." (Id.).

Plaintiff returned to work as an engineer. The engineer position pays less than a trainmaster position and is ineligible for certain bonuses available to trainmasters. He worked in this position for less than two years before taking medical leave on March 31, 2020. He remains on medical leave and does not have a return date. Defendant still employs Plaintiff.

In this case, Plaintiff asserts three claims against Defendant. Count One alleges discrimination under the Americans with Disabilities Act. Count Two alleges both FMLA retaliation and FMLA interference. Count Three alleges retaliation under the Employee Retirement Income Security Act.

This matter is now before the Court on Defendant's motion for summary judgment on all claims. Plaintiff does not oppose summary judgment as to Counts One and Three. (Doc. 17 at 272, fn. 6). Plaintiff opposes summary judgment on Count Two only to the extent it asserts FMLA retaliation. (Id.).

13

**Standard of Review**

Summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993). The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)). A fact is "material only if its resolution will affect the outcome of the lawsuit." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir.1993). The nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322). Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citation omitted).

## Analysis

Plaintiff's remaining claim is that Day retaliated against him for engaging in FMLA-protected activity. Plaintiffs may establish FMLA retaliation using either direct or circumstantial evidence. *See Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 326 (6th Cir. 2021).

### (1) Plaintiff's "Direct Evidence"

Direct evidence obviates the need to establish a prima facie case through circumstantial evidence. *Lautermilch v. Findlay City Schs*, 314 F.3d 271, 275 (6th Cir. 2003). "Once there is credible direct evidence, the burden of persuasion shifts to the defendant to show that it would have terminated the plaintiff's employment had it not been motivated by discrimination." *Id.* "Direct evidence is evidence that proves the existence of a fact without requiring any inferences." *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004). It is evidence that "if believed requires the conclusion that unlawful discrimination was at least a motivating factor." *Cushman-Langerstrom v. Citizens Ins. Co. of America*, 72 Fed. App'x 322, 331 (6th Cir. 2003) (citations omitted).

To determine whether allegedly discriminatory statements are direct and material, courts consider four non-dispositive factors: "'(1) whether the statements were made by a decision-maker . . . ; (2) whether the statements were related to the decision-making process; (3) whether the statements were more than merely vague, ambiguous or isolated remarks; and (4) whether

they were made proximate in time to the act of termination.'" *Pelcha v. MW Bancorp, Inc.*, 988

F.3d 318, 326 (6th Cir. 2021) (quoting *Diebel v. L & H Res., LLC*, 492 F. App'x 523, 527 (6th

Cir. 2012)). The direct evidence hurdle is high—"[f]or example, we have rejected the idea that

telling someone to 'retire and make everybody happy' was direct evidence of age discrimination,

as retirement does not necessarily refer to someone's age." *Id*. (quoting *Scott v. Potter*, 182 F.

App'x 521, 526 (6th Cir. 2006)).

Plaintiff offers the following "direct evidence" to causally link his FMLA-protected

activity to his eventual demotion: shortly after Plaintiff took leave in September 2017, Day

allegedly told Kyle Knautik that Day intended to fire Plaintiff when he returned from medical

leave. Plaintiff argues "Day told others that he would get revenge on [Plaintiff] for [Plaintiff]

having reported to [Defendant's HR Department] that he had prohibited [Plaintiff] from taking

medical leave." (Doc. 17 at 272). Defendant argues that Plaintiff misstates the record because

when Plaintiff discussed the threat in his deposition, Plaintiff stated that Day threatened

termination generally and not because of medical leave. This, according to Defendant, makes the

threat circumstantial evidence.[1] This Court agrees.

The *Pelcha* factors all weigh in favor of deeming the statement to be circumstantial

evidence. As to the first factor, Day was not a decision maker in the demotion process, but rather

Male and Anderson made the decision to demote Plaintiff. As to the second factor, the statement

was not related to the decisionmaking process because it was allegedly made in September 2017,

and  Plaintiff's incident and demotion did not occur until April and May of 2018. As to the third

factor, the statement was "vague" because it did not reference FMLA leave. Instead, according to

---

[1] Defendant also argues that the statement is double hearsay and that the court should not consider it on summary judgment. The Court need not reach this issue and will assume the statement is admissible for purposes of this motion.

Plaintiff's testimony, it was a general termination threat due to a personal vendetta. An inference is required to link the threatened termination to Plaintiff's FMLA activity, and circumstantial evidence, as opposed to direct evidence, requires the factfinder to make reasonable inferences. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (en banc).  Finally, as to the fourth *Pelcha* factor, the statement was made nearly eight months before Plaintiff's demotion, so it was not proximate to that decision. This Court concludes that Day's alleged statement is not direct evidence.

**(2) Plaintiff's Circumstantial Evidence**

FMLA retaliation claims based on circumstantial evidence of discrimination use the *McDonnell-Douglas* burden-shifting framework. *Donald v. Sybra, Inc.*, 667 F.3d 757, 761–62 (6th Cir. 2012) (citing *Edgar v. JAC Prod., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006) ("This court applies the familiar burden-shifting test articulated in [*McDonnell Douglas*] to retaliation claims under the FMLA.")). Plaintiff must establish: (1) he engaged in FMLA-protected activity; (2) he suffered an adverse employment action; (3) Defendant knew of the FMLA-protected activity; and (4) there is a causal connection between the adverse employment action and the FMLA-protected activity. *Seeger v. Cincinnati Bell Telephone Co.*, 681 F.3d 274, 283 (6th Cir. 2012) (citing *Donald v. Sybra*, 667 F.3d 757, 761 (6th Cir. 2012)). The plaintiff's burden to make the prima facie case is "minimal"—for example, mere temporal proximity between the adverse employment action and the FMLA-protected activity would suffice to show a causal connection between the two. *Id.* at 284–85 (collecting cases).

Once the plaintiff puts on this prima facie case, the burden shifts to the employer to offer a legitimate, non-discriminatory reason for its adverse employment action. *Id.* at 284. If the employer meets that burden, the plaintiff must show the proffered reason was pretextual and the

true reason for the adverse employment action was FMLA-based retaliation. *Id.* at 285 (citing *Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)). The plaintiff may show this in one of three ways: (1) the employer's action had no basis in fact; (2) the employer's reason, though factual, did not actually motivate the decision; or (3) the reason, though factual, would not suffice to warrant the adverse action. *Id.* at 285 (citing *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)); *see also Joostberns v. United Parcel Svcs. Inc.*, 166 Fed. App'x 783, 790–92 (6th Cir. 2006) (explaining the rule). At this stage, Plaintiff's burden is heavier; he must put forth "sufficient evidence from which a jury could reasonably reject [Defendant's] explanation of why it fired . . . [Plaintiff]." *Chen v. Dow Chem Co.*, 560 F.3d 394, 400 (6th Cir. 2009).

### (a) Plaintiff's Prima facie Case

This Court finds that Plaintiff establishes a prima facie case of FMLA retaliation. The only element of the prima facie case Defendant disputes is the requirement for a "causal connection" between Plaintiff's FMLA-protected activity and his demotion. (Doc. 16 at 250); *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 283 (6th Cir. 2012). Plaintiff argues that the temporal proximity between the adverse employment action and his protected activity is evidence of retaliation.

The Sixth Circuit has held that temporal proximity between the adverse employment action and the FMLA leave may satisfy the plaintiff's burden to show causation. *Id.* at 284–85 ("[T]he nearness in time between plaintiff's return from FMLA leave and his termination . . . suffices in these circumstances to meet the low threshold of proof necessary to establish a prima facie case of retaliatory discharge."); *see also Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 523–26 (6th Cir. 2008) (discussing temporal proximity and concluding that temporal proximity

by itself may satisfy prima facie causal connection burden). The latest measuring date for temporal proximity is the date on which the plaintiff returns from FMLA leave. *See Judge v. Landscape Forms, Inc.*, 592 Fed. App'x 403, 409–10 (6th Cir. 2014).

 In a Title VII case using the *McDonnell-Douglas* framework, the Sixth Circuit found a period of "just over three months" between the protected activity and the adverse employment action sufficient to establish a causal connection between the two. *See Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004). Other Sixth Circuit FMLA cases have similar results. *See Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007) (holding temporal proximity satisfied causal connection where adverse employment action occurred within three months of starting leave and within one day of returning to work); *Clark v. Walgreen Co.*, 424 Fed. App'x 467, 473 (6th Cir. 2011) (finding two months sufficiently proximal); *Judge v. Landscape Forms, Inc.*, 592 Fed. App'x 403, 409–10 (6th Cir. 2014) (two to three months sufficient).

Here, Plaintiff returned from FMLA leave on February 8, 2018. (Doc. 16 at 250). He was demoted from management on or about May 12, 2018. (Id.). This Court finds that the three-month period is sufficiently proximate to satisfy Plaintiff's low burden at this stage.

**(b) Defendant's Legitimate, Non-Discriminatory Reason**

Because Plaintiff establishes a prima facie case of FMLA retaliation, Defendant bears the burden of articulating a legitimate, non-discriminatory reason for demoting him. *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 284 (6th Cir. 2012). Defendant argues it fired Plaintiff for dishonesty surrounding the April 20, 2018 train incident. Dishonesty is a legally sufficient basis for termination and thus may serve as a legitimate, non-discriminatory reason for an adverse employment action. *Id.* at 284 ("Fraud and dishonesty constitute lawful, non-retaliatory bases for

termination."); *see also Joostberns v. United Parcel Servs., Inc.*, 166 Fed. App'x 783, 794 (6th Cir. 2006) (holding termination pursuant to dishonesty policy "is a legitimate reason to terminate Plaintiff because it is legally sufficient to justify a judgment for Defendant . . . ."). Although Plaintiff denies being dishonest, he admits Defendant has borne its burden to articulate a legitimate, non-discriminatory reason for his demotion. (Doc. 17 at 277). This Court finds that Defendant has satisfied its burden to articulate a legitimate, non-discriminatory reason for demoting Plaintiff.

**(c)  Plaintiff's Pretext Argument**

Because Defendant articulated a legitimate, non-discriminatory reason for its adverse employment action, the ultimate burden lies with Plaintiff to establish that the reason is a pretext for FMLA retaliation. Plaintiff may show this in one of three ways: (1) Defendant's action had no basis in fact; (2) Defendant's reason, though factual, did not actually motivate the decision; or (3) Defendant's reason, though factual, would not suffice to warrant the adverse action. *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012) (citing *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)); *see also Joostberns v. United Parcel Svcs. Inc.*, 166 Fed. App'x 783, 790–92 (6th Cir. 2006) (explaining the rule). At this stage, the burden on Plaintiff is heavier; Plaintiff must put forth "sufficient evidence from which a jury could reasonably reject [the employer's] explanation of why it fired . . . [plaintiff]." *Chen v. Dow Chem Co.*, 560 F.3d 394, 400 (6th Cir. 2009). Plaintiff must show both that the reason was pretextual and the true reason was discrimination. *Seeger*, 681 F.3d at 285 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)).

### 1. No Basis in Fact

Under the "no basis in fact" test, Plaintiff "must show that employer's proffered reasons never occurred or were actually false." *Brown v. Kelsey-Hayes Co.*, 814 Fed. App'x 72, 81 (6th Cir. 2020) (citing *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 470 (6th Cir. 2002)).

This test is subject to the "honest belief rule," which protects employers who make "reasonably informed and considered decision[s] before taking an adverse employment action." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998). "[T]he employee cannot establish pretext even if the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless." *Id.* at 806. The employer must show that it reasonably relied on "particularized facts" when it made the decision. *Id.* at 807. The "key inquiry" asks whether the employer's decision was "reasonably informed and considered . . . ." *Id.* The employer's evidence of honest belief can be overcome by evidence showing "'the employer made an error too obvious to be unintentional . . . '" such that the investigation is "unworthy of credence." *Id.* (quoting *Fischbach v. D.C. Dept. of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996)).

An investigation need not be "optimal"—specifically, it does not need to involve interviewing the employee or witnesses. *Seeger v. Cincinnati Bell Tele. Co.*, 681 F.3d 274, 286 (6th Cir. 2012) (citing *Smith*, 155 F.3d at 807; *McConnell v. Swifty Transp., Inc.*, 198 Fed. App'x 438, 444 (6th Cir. 2006)). But when an upper-level decision maker who harbors no discriminatory animus is influenced by a lower-level supervisor who does harbor such animus, the "cat's paw" doctrine may adhere. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 418–21 (2011) (adopting the "cat's paw" doctrine in employment discrimination case). Cat's paw liability attaches where the biased supervisor's actions are "a causal factor of the ultimate employment action." *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 352 (6th Cir. 2012) (quoting *Staub*,

562 U.S. at 153–54). The employer is not liable for the biased supervisor's acts if "the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action." *Id.* (quoting *Staub*, 562 U.S. at 153–54). Thus, a "biased report" from a lower-level supervisor may be a causal factor in the adverse employment action if the decision maker's investigation does not independently determine that the adverse action was justified even without the biased supervisor's recommendation. *Id.* (citing *Staub*, 562 U.S. at 154).

In *Seeger*, an employee told his employer that he was unable to work due to his health status, reporting "excruciating" pain. *Id.* at 278–80. When two fellow employees spotted him walking around at an outdoor event, they reported him to management. *Id.* at 280. Management reviewed letters from the employee, his doctor, and his fellow employees, as well as information from the employee union and the employee's medical records. *Id.* Management determined that he had "over-reported" his symptoms to avoid working and terminated him for disability fraud. *Id.* The employee brought suit against the employer for violating his FMLA rights, but the district court held the employer had an "honest belief" that he had engaged in disability fraud. *Id.* at 280–81. On appeal, the Sixth Circuit agreed and found that the employer had engaged in a thorough investigation, including interviewing witnesses and taking their formal statements. The Sixth Circuit declined to invade this investigatory process and instead focused on whether the employer could have an "honest belief" in its reason. *Id.* The employee did not refute the employer's honest belief that his ability to walk around was inconsistent with his reported "excruciating" pain, and so he did not prove that the reason was pretextual for discrimination. *Id.*

Here, Plaintiff argues that Defendant's dishonesty justification has no basis in fact because: (1) Plaintiff's initial denial that he had told the crew he would protect the shove was consistent with the crew's statements; (2) running through switches happens "somewhat

22

regularly" and does not result in termination; and (3) during the investigation, Defendant's upper-level management "relied heavily (if not exclusively)" on Day, to whom Plaintiff attributes discriminatory animus as evidenced by Day's alleged statement threatening to terminate Plaintiff when Plaintiff returned from leave.

In response, Defendant maintains that Plaintiff was dishonest in his original report because he told Day and Sarver that he did not know why the conductor had failed to ride the shove movement and said the crew was "remorseful" for not protecting the shove in that way. This was inconsistent, according to Defendant, with Plaintiff's later admission to Sarver—as well as Plaintiff's deposition testimony—that Plaintiff told the conductor to use a car count and to remain on the east end of the train. Defendant also argues it is immaterial, as a matter of law, whether Plaintiff was actually dishonest; it matters only whether Defendant's decision makers could have "honestly believed" that Plaintiff was dishonest.

Defendant further argues that its investigatory process was sufficiently shielded from Day's influence. Day testified that he had "zero" involvement in the decision to demote Plaintiff, and Day, Sarver, and Male all testified that neither Day nor Sarver offered disciplinary advice to Male. Defendant argues Male and Anderson had "reviewed the entire investigation record" which included "two written statements from Sarver, one written statement from Day, one written statement from Whitfield, questions and answers prepared by Whitfield, and written statements from conductor Jason Melton, engineer James Biller, and yardmaster Jason Hudson." Sarver and Day reviewed the radio tapes from the incident and concluded there was "nothing . . . of substance . . . ."[2] (Doc. 12–1 at 189). Sarver's statements included summaries of two phone interviews with Whitfield.

---

[2] Plaintiff argues that Defendant destroyed the audio tapes from the incident and that they would have revealed what Plaintiff really said to the crew. (Doc. 17 at 268, fn. 4). Because Plaintiff believes Defendant destroyed the tapes,

This Court finds that Defendant held an honest belief that Plaintiff had been dishonest. Defendant's upper-level management engaged in a thorough investigation. The initial investigatory record included written statements from the yardmaster, engineer, conductor, Plaintiff, and Day. Sarver, who is not accused of bias, asked for these underlying statements after speaking with Day and Plaintiff in the aftermath of the incident. Sarver then wrote a full report and a summary based on his review of these statements, a statement from Day, and two telephone calls with Plaintiff. He forwarded these materials to Male who reviewed them with HR Representative Anderson. They concluded Plaintiff had been dishonest. Plaintiff appealed that decision, and the Head of Arbitration and Discipline upheld it.

Even though Plaintiff argues that Male or Anderson should have interviewed him, neither was required to do so. *Seeger v. Cincinnati Bell Tele. Co.*, 681 F.3d 274, 286 (6th Cir. 2012) (noting that a thorough investigation need not include witness interviews). Furthermore, Male reviewed materials based on interviews and statements of not only Plaintiff, but also the yardmaster, engineer, and conductor.

Sarver and Male both testified that according to the investigation materials, Plaintiff had been dishonest when he originally stated he did not know why the conductor was on the east end of the train instead of riding the shove on the west end. Plaintiff's original written statement expressed ignorance as to why the conductor was not on the west end "riding the shove," which

---

Plaintiff asks the Court to make an adverse inference as to what the tapes would have revealed. (Id.). Plaintiff's support for this destruction theory is Sarver's testimony, but Sarver's testimony only says he listened to the audio tapes contemporaneously with the train incident and does not know why they were not produced in this case. (Doc. 12–1 at 189). Defendant argues there is no evidence showing it destroyed the tapes. (Doc. 18 at 295).

The case to which Plaintiff cites for an adverse inference involved prior court findings that a witness had failed to preserve evidence which the witness had a duty to preserve before the court awarded an adverse inference. *EPAC Techs., Inc. v. Harpercollins Christian Publ'g, Inc.*, No. 3:12-cv-00463, 2019 WL 109731, at *11–12 (M.D. Tenn. Jan 4, 2019). Here, there is no indication in the record that Plaintiff asked Defendant for these tapes, Plaintiff did not move this Court to compel Defendant to provide them, and Plaintiff has not argued to this Court that they should have been preserved. Thus, this Court will not grant Plaintiff an adverse inference.

24

is the only method Defendant allows to protect shove moves. (Doc. 11–2 at 173) ("I immediately
. . . asked the conductor why he wasn't riding the shove to protect it?"). But he later testified at
deposition in this case that he told the conductor to remain on the east end and to use the car-
counting method. (Doc. 9–1 at 72) ("Q: Did you ever direct the conductor to remain on the east
end during the shove? A: I did.").

Plaintiff states in his declaration that he told Day on their first phone call after the
incident that he had instructed the conductor to use a car count.[3] Assuming Plaintiff made this
oral statement to Day, it was not recorded and it was not before Male, the ultimate decision
maker. Instead, Male relied on Plaintiff's written statement, wherein Plaintiff says he did not
know why the conductor failed to ride the back of the shove movement. More importantly, Male
further relied on Sarver, who concluded independently that Plaintiff had been dishonest. Sarver
so concluded when comparing Plaintiff's written statement—stating he did not know why the
conductor was not riding the shove from the west—to Plaintiff's admission on the call between
Plaintiff and Sarver that Plaintiff had told the conductor to stay on the east end. Male and
Anderson cite the inconsistency between Plaintiff's written statement and his oral statement as
the reason for Plaintiff's demotion. (Doc. 11–2 at 168; Doc. 13–1 at 216–17).

Male and Anderson also believed Plaintiff had been dishonest in failing to disclose that
he had assumed responsibility for "protecting" the shove movement. The extent of Plaintiff's
responsibility for "protecting" the shove remains in dispute. Plaintiff argues the crew statements
do not show he intended to "protect the shove." But this is immaterial, because there is no

---

[3] Plaintiff also argues he had been told to use car counts by another trainmaster, Mark Smith, and so he should not
be punished for instructing the conductor to do so. As Defendant correctly notes, however, Plaintiff's testimony
shows only that Smith told Plaintiff to "expedite" moves by placing himself on the west end of the yard to give
conductors rides to the front. (Doc. 9–1 at 69). It does not mention using car counts. Even if Smith had told Plaintiff
to use car counts, Plaintiff was not demoted for telling the conductor to use a car count. Defendant demoted Plaintiff
for failing to reveal in his initial statement that he had told the conductor to do so.

evidence showing the decision makers did not "honestly believe" he had done so. As explained in *Smith*, even "mistaken, foolish, trivial, or baseless" reasons will suffice so long as the employer honestly believed them. *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998). Thus, even if Male and Anderson were mistaken that crew statements indicated Plaintiff had assumed responsibility for protecting the shove, they could honestly believe he had assumed such responsibility based on the totality of the evidence before them.

All told, Defendant's investigation was "reasonably informed," and the decision was "considered." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998). The "particularized facts" included a plethora of statements. *Id.* The investigatory process involved two unbiased managers, an HR representative, and the Head of Arbitration and Discipline—none of whom Plaintiff accuses of FMLA bias. This Court concludes that the record lacks "an error too obvious to be unintentional" and rejects Plaintiff's "no basis in fact" argument. *Id.*

This Court also finds that Plaintiff's "cat's paw" theory does not overcome Defendant's honest belief. Plaintiff argues Male "relied primarily (if not exclusively)" on Day in making the demotion decision, citing a portion of Male's testimony where Male says he only relied on "information from Mr. Day" and written statements. (Doc. 17 at 268; Doc. 13–1 at 213). But, as Defendant points out, another portion of Male's testimony shows Male and Anderson had reviewed the entire investigation record for their decision, which Defendant correctly argues included "two written statements from Sarver, one written statement from Day, one written statement from Whitfield, questions and answers prepared by Whitfield, and written statements from conductor Jason Melton, engineer James Biller, and yardmaster Jason Hudson." (Doc. 13–1 at 215; Doc. 18 at 291). The record reveals Male and Anderson relied on much more than Day.

Plaintiff further argues HR was not meaningfully involved in the demotion because Anderson did not personally conduct interviews. But whether Anderson was "meaningfully involved" does not lessen the fact that management conducted a thorough, underlying investigation. Moreover, this argument does not undermine the conclusion that Male and Anderson "honestly believed" their demotion decision was justified. Although Anderson did not herself conduct interviews, personal interviews are not required for a thorough investigation to trigger the honest belief rule. *Seeger v. Cincinnati Bell Tele. Co.*, 681 F.3d 274, 286 (6th Cir. 2012) (citing *Smith*, 155 F.3d at 807; *McConnell v. Swifty Transp., Inc.*, 198 Fed. App'x 438, 444 (6th Cir. 2006)). Moreover, the relevant question remains whether Anderson could have "honestly believed" that Plaintiff had been dishonest in his original reporting. As concluded above, she could have so believed.

Finally, Plaintiff argues that Day convinced Male that Plaintiff had lied, resulting in Plaintiff's termination from management. The Court assumes Plaintiff is relying on Day's written statement because Plaintiff has not identified any other communication between Day and Male. As Defendant points out, however, Day's written statement that was reviewed by Sarver, Male, and Anderson contains no mention of dishonesty and does not contain a disciplinary recommendation. (Doc. 11–2 at 172). Instead, Day merely references the yardmaster's statement: "[Plaintiff] called crew on radio and stated he would head to west end to watch/assist with shove and keep conductor at East End." (Doc. 11–2 at 182). At most, Day's written statement only hints at dishonesty in Plaintiff's original reporting. (Id.).

More importantly, Sarver conducted his own investigation and had a phone call with Plaintiff. On this phone call, it was Sarver—not Day—who was the first to hear Plaintiff admit to telling the conductor to remain on the east end of the train. Sarver independently concluded

Plaintiff was dishonest. (Doc. 11–2 at 171). Male and Anderson reached the same conclusion. (Doc. 11–2 at 168). Because Sarver independently concluded Plaintiff had been dishonest, and because Male relied on Sarver's conclusion in his ultimate determination, the decision makers determined demotion was justified without any involvement from Day. *See Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 352 (6th Cir. 2012) (explaining that "honest belief" only defeats a "cat's paw" allegation if the decision maker's investigation independently determines that the action was justified without biased supervisor's involvement).  Thus, Plaintiff has failed to demonstrate that Male acted as Day's "cat's paw."

For these reasons, Plaintiff fails to show that Defendant's reason for demoting him had no basis in fact.

### 2.  Did Not Actually Motivate

A plaintiff may also prove that the employer's legitimate, non-discriminatory reason was a pretext for discrimination by showing that the reason did not actually motivate the adverse employment action. *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012). To do so, the plaintiff must put forth a preponderance of evidence "which tend[s] to prove that an illegal motivation was *more* likely than that offered by the defendant." See *Brown v. Kelsey-Hayes Co.*, 814 Fed. App'x 72, 82 (6th Cir. 2020) (citing *Brennan v. Tractor Supply Co.*, 237 F. App'x 9, 9 (6th Cir. 2007) (citation omitted)). As with the "no basis in fact" test, a plaintiff must "produce 'sufficient evidence from which a jury could reasonably reject [the employer's] explanation of why it fired . . . [the employee].'" *Id.* (quoting *Chen v. Dow Chem Co.*, 560 F.3d 394, 400 (6th Cir. 2009)).

Plaintiff argues his alleged dishonesty did not motivate the demotion decision for a variety of reasons. Plaintiff alleges Day had previously prevented him from taking medical leave,

which he believes shows hostility towards protected activity. He alleges Day gave him a poor performance review after Plaintiff returned from medical leave even though Day had only supervised Plaintiff for approximately three weeks. He also argues that Day put him in charge of a busy yard without proper training after giving him a "poor" performance review, which he suggests was a setup to make him fail. Additionally, Plaintiff points out that no other crew member was disciplined for the train incident, his demotion was temporally proximate to his medical leave, Day allowed managers to get away with lying in the past without discipline, and Male failed to interview Plaintiff.

Defendant argues that two managers, other than Day, and an HR representative independently concluded that Plaintiff was dishonest after reviewing Plaintiff's statements. Most importantly, Day was not involved in the decision to demote Plaintiff.

This Court finds Plaintiff fails to show a genuine issue of material fact as to whether FMLA discrimination was *more* likely than his alleged dishonesty. Day's past behavior towards managers is not relevant because he was not involved in the decisionmaking process and did not exert influence over that process. The decision makers—Male and Anderson—concluded that Plaintiff had been dishonest. Both testified that they took this dishonesty very seriously, particularly because it resulted in the crew being suspended. The record supports an omission or dishonesty on Plaintiff's behalf by failing to report in his original written statement that he had instructed the conductor to remain at the east end of the train.

As for Plaintiff's argument that Day's involvement actually motivated his demotion, there is no evidence in the record that Day offered a disciplinary recommendation to any upper-level managers. Furthermore, Sarver, a non-biased manager, was involved in the investigation from the ground floor. Even though it was Day who first became skeptical of Plaintiff's story, it

was Sarver who first learned Plaintiff had been dishonest in his original reporting of the conductor's position, and Sarver's conclusion about Plaintiff's dishonesty was reported up the chain without Day's influence.

Although Plaintiff correctly notes no other crewmember was disciplined for the run-through-switch incident, Defendant did not punish Plaintiff because the train went through a switch; Defendant punished Plaintiff because Male and Sarver believed he had been dishonest about his involvement in the incident. The crew was not accused of dishonesty.

Thus, this Court finds Plaintiff fails to show that his alleged dishonesty did not "actually motivate" the decision to demote him.

### 3.  Was Not Sufficient to Justify

A plaintiff may also establish pretext by showing that the reason for the adverse employment action was not sufficient to justify the adverse action. *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012). The plaintiff retains the burden to show "the true reason is discrimination." *Woodruff v. Ohman*, 29 Fed. App'x 337, 344 (6th Cir. 2002).

Plaintiff argues his "spotless record" and twenty-year employment record should have entitled him to remedial action rather than demotion. But a good record of employment is irrelevant, because "it proves no more than that absent any misconduct on [Plaintiff's] part, [Defendant] was unlikely to terminate his employment." *Id.* (quoting *McConnell*, 198 Fed. App'x at 443). In fact, Male testified that he took Plaintiff's alleged dishonesty very seriously because it had led to the crew being pulled from service even though Male believed Plaintiff was ultimately at fault. This, according to Defendant, was sufficient to demote him. The Court finds that Plaintiff has failed to show a dispute of material fact as to the sufficiency of the reason that led to his demotion.

Even if Plaintiff could demonstrate demotion was unwarranted for his alleged dishonesty, he must still show FMLA retaliation was the reason he was demoted. *Woodruff*, 29 Fed. App'x at 344.  Plaintiff has failed to do so. Male did not know of the negative history between Day and Plaintiff and did not know that Plaintiff had ever taken FMLA leave, and Plaintiff does not allege that Anderson knew of this history.[4]

Thus, this Court finds that Plaintiff has failed to show that Defendant's proffered reason was insufficient to warrant his demotion and also finds that he failed to show that the real reason he was demoted was FMLA retaliation.

**Conclusion**

For the foregoing reasons, this Court GRANTS Defendant CSX Transportation, Inc.'s Motion for Summary Judgment.


IT IS SO ORDERED.

                                              /s/ Patricia A. Gaughan
                                           _____
                                              PATRICIA A. GAUGHAN
                                              United States District Judge
Dated:  10/13/21                              Chief Judge

---

[4] Plaintiff also argues that Defendant has a history of retaliating against FMLA activity. Plaintiff offers a complaint in another case against Defendant in the District of Maryland to show a "pattern and practice." But pleadings—and especially pleadings offered in another case—are not evidence. *See Shreve v. Franklin Cty., Ohio*, 743 F.3d 126, 136 (6th Cir. 2014) ("[*P*]*leadings are not evidence*") (emphasis in original). Even if the complaint could be considered, a single complaint certainly does not show a "pattern and practice" of discriminatory behavior.